# EXHIBIT
# A

AUG 22 2006  11:58

The Law Office of Michelle J. Douglass, L.L.C.
By: Michelle J. Douglass, Esquire
1201 New Road, Suite 335
Linwood, New Jersey 08221
(609) 788-3595
(609) 788-3599 - telefax
Attorney for Plaintiff

| | |
|---|---|
| FRANCIENNA B. GRANT<br>Plaintiff,<br><br>v.<br><br>OMNI HEALTH SYSTEMS OF<br>NEW JERSEY, ADVANTAGE<br>REHABILITATION, L.L.C.,<br>LINCOLN SPECIALTY CARE<br>CENTER, PAT CILIECKI,<br>RONILDA PULIDO, ROWENA<br>PERSONA and LUCY CRISPIN,<br>JOHN and MARY DOES (1-4),<br>individually, jointly and severally<br>Defendants. | SUPERIOR COURT OF<br>NEW JERSEY<br>LAW DIVISION<br>CUMBERLAND COUNTY<br><br>Docket No. CUM-L- 822-06<br>Filed 8-10-2006<br>Civil Action<br><br>**COMPLAINT, JURY DEMAND<br>& DESIGNATION OF TRIAL<br>COUNSEL** |

Plaintiff, Francienna B. Grant residing in Cape May County, State of New Jersey, by way of complaint against the Defendants, Pat Cilieki, Ronilda Pulido, Rowena Crispin, Omni Health Systems of New Jersey, Advantage Rehabilitation, L.L.C. and Lincoln Specialty Care Center located at 1640 South Lincoln Avenue, Vineland, County of Cumberland, State of New Jersey, says:

## THE PARTIES

1.   The Plaintiff, Francienna B. Grant, ("Grant") is an individual who resides in Cape May County, New Jersey.

2.   The Defendant, Omni Health Systems of New Jersey ("Omni"), is a business licensed by the State of New Jersey and is a multi-facility organization that owns nursing homes, including the Defendant, Lincoln Specialty Care Center. Omni also owns the Defendant, Advantage Rehabilitation, L.L.C.

3.   The Defendant, Advantage Rehabilitation, L.L.C., ("Advantage Rehabilitation") is a for-profit business with its main office located at 26 Journal Square, 16th floor, Jersey City, New Jersey, 07306 and employs individuals to work at Lincoln Specialty Care Center, located at 1640 Lincoln Avenue, Vineland, New Jersey, 08360.

4.   The Defendant Lincoln Specialty Care Center ("LSCC") is located at 1640 South Lincoln Avenue, Vineland, New Jersey and is a long term care facility providing on-site sub-acute rehabilitation, dialysis, IV therapy and other medical and personal care.

5.   The Defendant, Pat Cilieki, ("Cilieki") was at all time relevant hereto, the Regional Director of Nursing employed by Omni, and was responsible for the oversight of all nursing staff employed by Omni within her designated region, including

2

Lincoln Specialty Care Center. At all relevant times, Cileki was the employee, agent and servant of Omni Health Systems.

6.      The Defendant, Ronilda Pulido, ("Pulido") was at all times relevant hereto, the Regional Director of Rehabilitation employed by Advantage Rehabilitation, was responsible for the oversight of all rehabilitation staff employed by Omni within her designated region, including LSCC. Pulido, was at all times relevant hereto, Grant's immediate supervisor. At all relevant times, Pulido was the employee, agent and servant of Advantage Rehabilitation, L.L.C and/or Omni Health Systems.

7.      The Defendant, Lucy Crispin, ("Crispin") at all relevant times hereto, is a registered nurse and Manager of Unit A at LSCC and is responsible for all the staff and patients assigned to this long term care unit  and was hired by Advantage Rehabilitation, L.L.C. and/or Omni Health Systems. At all relevant times, Crispin was the employee, agent and servant of Advantage Rehabilitation, L.L.C and /or Omni Health Systems.

8.      The Defendant, Rowena Persona, ("Persona") at all times relevant hereto, is an Occupational Therapist hired by Advantage Rehabilitation and/or Omni Health Systems to perform quality assurance at LSCC. At all relevant times, Persona was the employee, agent and servant of Advantage Rehabilitation, L.L.C and /or Omni Health Systems.

9.    The Defendants, John and Mary Does (1 4) are owners, employees and/or representatives of Omni Health Systems, Advantage Rehabilitation, L.L.C and/or Lincoln Specialty Care Center who were involved and/or had any role in the decision to terminate the Plaintiff's employment as the Lead Therapist with Advantage Rehabilitation, L.L.C. in violation of the laws as more fully described below.

## FACTUAL BACKGROUND

10.   On or about January 12, 2004 the Plaintiff, Francienna B. Grant began employment for Advantage Rehabilitation, at the Lincoln Specialty Care Center (LSCC), as the Lead Therapist and treating Physical Therapist in the LSCC Rehabilitation Services Department. Grant was terminated from employment with Advantage Rehabilitation on January 17, 2006.

11.   At all relevant times, Grant was the Lead Therapist, and in accordance with the Rehabilitation Services Department Organizational Chart, Grant was supposed to be responsible for overseeing various positions in the Rehabilitation Services Department such as the Licensed Physical Therapist (LPT), Speech Language Pathologist (SLP), Registered Occupational Therapist (OTR), Licensed Physical Therapist Assistant (LPTA), Certified Therapist Assistant (COTA), and Rehabilitation Aides. In reality, the Rehabilitation

4

Department was short staffed from the date of Grant's hire through to her termination from employment.

12. As a licensed Lead Physical Therapist, Grant became a liaison between the therapy staff and the other Departments within the facility. Grant's goal was to promote high quality patient care and maintain patient rights and dignity. She would be in frequent contact with the other departments and disciplines within the facility in order to achieve her goals.

13. Grant performed her duties as the Lead Therapist in an exemplary manner. Indeed, on January 21, 2005 Grant received an exceptional performance evaluation. Grant's supervisor, Pulido, noted on Grant's performance evaluation "Fran is a competent physical therapist. She had shown expertise in clinical performance and decision making regarding patient's plan of care."

14. On or about June 21, 2005, a therapist under the supervision of Grant noticed that a patient (ABC) assigned to Unit A, and who had recently undergone surgery for the installation of a pace maker, was in apparent distress while in the therapy room.

15. The therapist immediately notified Defendant, Lucy Crispin, who was in charge of Unit A at the time. Crispin stated that she would take care of the matter. Instead, Crispin ignored the patient (ABC) and left work for the day advising no one of the patient's condition.

16.   Grant went to Unit A to check on the status of the patient (ABC). Grant observed the patient (ABC) in her wheelchair struggling to get to her room.   Alarmed, she contacted the nurse on duty so that the patient (ABC) would be attended to. Thereafter, it appeared that the needs of patient (ABC) were being addressed and Grant left the area. Grant later learned that the nursing department did not send the patient (ABC) to the hospital for care until many hours later.

17.   Grant placed a telephone call to her supervisor, Pulido, and told her that the patient (ABC) had been neglected by Unit A nursing staff when they failed to promptly respond to a patient (ABC) who had been in apparent distress. Grant stated that she believed that this patient (ABC) was left unattended and that this was wrong. Grant further informed Pulido that she believed that the Unit A nurses knew that this patient (ABC) had no one to advocate on her behalf since the only known living family member was her son who too was in the facility resided in the assisted living unit. Pulido advised that she would look into the matter. Grant told Pulido that she would not let this drop; she wanted the matter investigated.

18.   On June 22, 2005, Grant attended a daily Department Head meeting wherein the Administrator, Kathy Bell, Lucy Crispin and other department heads also attended. Grant inquired of the nursing staff the status of the patient referred to in the above paragraph. Grant expressed her

6

HUG-22-2006   12:00                                                                            P.12

concern that the patient (ABC) had been neglected by nursing and wanted to know the reason(s) the patient (ABC) had not been provided with medical care for more than eight hours after it became apparent that the patient was in distress. When no one present provided any reasonable response and it was evident that it was a matter that no one other than Grant cared to discuss, Grant told everyone in the room that what had happened with this patient (ABC) was wrong. She named aloud the names of each of the individuals in the room to let them know that she was aware that they were witness to her concerns regarding this patient's (ABC) care and her reporting this in the Department Head meeting.

19.   On June 23, 2005, the patient (ABC) referenced in the above paragraph died. Upon learning that this patient (ABC) had died, Grant went to the Administrator's office and spoke with Administrator Bell to inquire into the status and circumstances leading up to the patient's (ABC) death. Grant was aware that the patient's (ABC) death may have been a "sentinel event", i.e., an unexpected occurrence involving a death, which required the need for immediate investigation and response. Administrator Bell advised Grant that she would look into the matter.

20.   Grant also spoke to Pat Saley, the Regional Quality Assurance Nurse employed by Omni Health Systems about the patient's (ABC) death on June 23, 2005. Saley said that She would have the Director of Nursing look into the matter.

21.   Upon information and belief, there has been no investigation or response regarding the patient (ABC) who died on June 23, 2005 as referenced above.

22.   On or about July 6, 2005, a care conference was held for the family of another patient (DEF). Present at the meeting were Grant, Crispin, Adrienne Goldsboro, Director of Social Services, Sandy Bechdorf, who was the past Director of Nursing and two visitors; one of whom had the Power of Attorney of the patient (DEF) and a friend of the patient (DEF). While at the meeting, Grant explained that the patient (DEF), a stroke victim, was making progress with his cognitive abilities and daily functions. After Grant gave her input about the Rehabilitation Department's perspective on the patient (DEF) she left the room. Grant was aware that the person who held the Power of Attorney for the patient (DEF) may have wanted to have the patient (DEF) remain in the facility indefinitely, that is, until his ultimate demise. Grant could not support this wish as the patient (DEF) had in fact been making cognitive development since his admission to LSCC.

23.   Upon information and belief, Crispin supported the position that the patient remain in the facility in accordance with the Power of Attorney's desire as referenced in the paragraph immediately above despite the patient's (DEF) true condition. As soon as Grant left the care conference on July 6, 2005, Crispin unprofessionally said to the visitors, that is, to the person who held the Power of Attorney and the friend, that

8

they should not pay attention to Grant because the Rehabilitation Department (Grant) did not know what they were talking about.

24. The inappropriate statement by Crispin regarding the expertise of the Rehabilitation Department as described above was reported by Adrienne Goldsboro, Director of Social Services to Administrator Bell. Grant advised her immediate supervisor, Pulido of this situation and warned that she hoped Crispin was not misrepresenting the status of patients or the capabilities of the Rehabilitation Department in Grant's absence.

25. Upon information and belief, shortly after the incident as immediately described above, another patient (GHI) who was assigned to Unit A, after suffering from a closed head injury, fell out of a chair because he was not wearing his Rehabilitation issued belt.

26. The nursing staff is responsible to ensure that all patients utilize all equipment issued and prescribed by the Rehabilitation Department. Crispin and others attempted to cover up the fact that the patient (GHI) had fallen from his chair without having been secured with his prescribed safety belt. The nursing staff requested that Grant sign off on a document which described the incident as the patient (GHI) haven fallen out of bed. Grant advised that the incident report was untrue and that she would not sign the report. Later, Grant complained at a weekly meeting that the patient (GHI)

9

did not have his Rehabilitation issued belt on at the time of his fall.

27.   The patient (GHI) who had fallen as a result of not having his safety belt on him at the time he was permitted to sit in a chair located near the nurse's station shortly thereafter died from head injuries suffered in this fall. Upon information and belief, this too constituted a sentinel event but was not investigated.

28.   Grant thereafter began to complain that the Admissions Department was not properly classifying people for admission to the facility. Grant observed that Unit A, which is where the long-term patients were suppose to be located, were not receiving good care because the staff assigned to the unit tended to neglect them. For instance, many of the patients would be left in their beds all day because the staff did not want to exert the physical energy and/or time and/or work associated with moving the patients out of bed.

29.   The staff in Unit A refused to get patients out of bed for physical therapy. The staff in Unit A would purposefully hide patient wheelchairs and offer the excuse that the wheelchair was lost or missing and, therefore, the patient had to remain in bed. This and other patient neglect issues especially concerned Grant with respect to the misclassification of patients for assignment to Unit A, when many times the patient was a sub-acute care patient who

required only short-term care for remediable or rehabilitable problems.

30.   On or about August 25, 2005, Grant reported to her supervisor, Pulido that the Restorative program was not being performed by the nursing staff. Grant also advised the Administrator, the Director of Nursing and the Assistant Director of Nursing that the nursing staff was not completing its duties under the Restorative program.

31.   On or about August 25, 2005, the weekly report submitted by Grant also reflected the fact that the LSCC staff continued to swap and misuse patient assigned wheelchairs and misplace (lose) assigned equipment in order to avoid job responsibilities. Grant expressed concern about patient safety because the facility had been previously cited by the State of New Jersey for violations with respect to patient issued equipment.

31.   On or about September 22, 2005, Grant reported that the nursing staff was not reporting to the Rehabilitation Department when patients were admitted to the facility and in the building. Grant advised that this and other violations of protocol were placing the facility in jeopardy with respect to licensing, and Medicare Violations.

32.   On or about October 16, 2005, Grant addressed a letter to Linda Dooley, a shareholder/owner of Advantage Rehabilitation, and Omni Health Systems, regarding highly unprofessional conduct exhibited toward Grant by the Director

of Nursing with respect to an issue involving the billing information sent to an insurance company on behalf of a patient.

33. The Director of Nursing, Linda Falluca, was screaming in front of other staff members and patients that the therapy notes from the Rehabilitation Department "sucked." The Director of Nursing, Falluca, used the word "sucked" several times in front of others including Grant.

34. Later it was determined that the Rehabilitation Department properly submitted the information to the insurance company for which Falluca had claimed "sucked." The Director of Nursing, however, overreacted and immediately saw this as an opportunity to blame the Rehabilitation Department for wrongdoing because she was upset with the fact that Grant was properly reporting wrongdoing and patient neglect by the nursing staff for which she, as the Director of Nursing, was responsible.

35. On or about December 9, 2005, Unit A Manager Crispin, who was angry that Grant continued to report patient neglect and other patient care issues by her staff, became verbally abusive and physically threatening to Grant.

36. On or about December 11, 2005, Grant reported to her supervisor, Pulido, the incident on December 9, 2005 and that she feared for her physical safety as a result of Crispin's abusive behavior.

37.   On or about December 15, 2005, Grant requested a meeting with Pat Celieki to report the conduct of Crispin and more importantly, to inquire why none of her concerns about patient safety and neglect were being addressed. Grant again asked about the status of patient (ABC) who had died as a result of the nursing staff unreasonably failing to assess and address the patient's condition. Celieki informed Grant that she would look into it. Celieki never got back to Grant regarding any of her concerns.

38.   On or about December 20, 2005, Grant submitted her weekly report to Pulido which reflected continued concerns over missing equipment, Medicare fraud issues and overall patient neglect.

39.   On or about December 27, 2005, the Director of Nursing, Linda Falluca and the On-Site Admissions Coordinator, Jessica Alvarez were caught breaking into Grant's locked desk. Neither Falluca nor Alvarez had any business related reason for being in the Rehabilitation Department nor for breaking into Grant's locked desk.

39.   After the break in, Grant discovered that her "soft" notes and other records were missing. In particular, the documents that Grant had maintained with respect to patient (ABC) who had died on June 23, 2005 were missing.

40.   On or about December 29, 2005, Grant advised her supervisor, Pulido, that her desk had been broken into on December 27, 2005 and to request additional therapists for

the Rehabilitation Department in order to provide patients with physical therapy who were not receiving physical therapy despite the fact that they had paid for it.

41.   On or about January 3, 2005, Grant advised her supervisor, Pulido, that the Policy and Procedure book had been missing from the facility for three to four weeks and that the Policy and Procedure book should be in the facility and accessible at all times.

42.   On or about January 4, 2005, Grant questioned Defendant, Rowena Persona about a recent directive she issued requiring Grant and/or the Rehabilitation Department should provide anticipated minutes (billable time) on Medicare Data Sheets for patients not on caseload. Patients on the Rehabilitation Department's caseload are able to be evaluated for rehabilitation services and minutes for purposes of Medicare billing. Thus, billing may be submitted to Medicare for anticipated future treatment. Patients not on the Rehabilitation Department's caseload are not candidates for rehabilitation services and, therefore, there is not any legitimate reason to forecast anticipated billable minutes for submission for payment to Medicare. Grant refused to abide by the directive.

43.   On January 17, 2006, Defendant Pulido called Grant into an unexpected meeting wherein a Performance Evaluation of Grant was given.

14

44.   Defendant Pulido evaluated Grant's overall work performance as below satisfactory and cited that Grant was unable to maintain good working relationships both within the Department and with other Departments. Cited also was an unsatisfactory result from Rowena Persona regarding a Rehabilitation Operations Quality Assurance conducted by Persona. Grant was advised that she failed to "resolve personnel concerns at the departmental level"; and, that she did not represent "the organization in a positive and professional manner"; and, that she did not consult "with other departments as appropriate to collaborate in patient care and performance improvement activities."

45.   Immediately following the performance review, Pulido told Grant she was fired. Pulido provided no advance notice that Grant's job was in jeopardy. Grant was not provided with any prior warning that her performance was unsatisfactory.

46.   At all relevant times, Grant's performance of her duties as the lead Physical Therapist was satisfactory. Grant was terminated from employment because Defendants were threatened by Grant who called into question and reported quality assurance violations and other illegal conduct by Defendants.

FIRST COUNT
## (Conscientious Employee Protection Act)

47.   The Plaintiff, Francienna B. Grant, hereby repeats and incorporates by reference each and every allegation set forth in the preceding paragraphs of the Plaintiff's Complaint, as if more fully set forth at length herein.

48.   Grant disclosed to her supervisors wrongful activity, practice and policy by Defendants and she objected to and refused to participate in any activity and/or practice which she reasonably believed to violate the law and/or that was incompatible with a clear mandate of public policy. N.J.S.A. 34:19-3.

49.   As a direct and proximate result of Grant's disclosure of the wrongful activity, practice and policy of the Defendants, as well as her refusal to participate in illegal activity, she was retaliated against by Defendants and was caused to suffer an adverse employment action in the form of termination from her employment with Defendant Advantage Rehabilitation, L.L.C.

50.   As a result of the Defendant's conduct set forth above, Plaintiff has been caused to suffer damages and is entitled to any and all loss wages and benefits, reinstatement to her former position or, alternatively, front pay. Additionally, Plaintiff has suffered a loss to her reputation and good name.

She has suffered emotional distress as a result of her loss and the hardship it has brought upon her. She suffers bodily injury manifested from emotional distress, hardships and uncertainty with respect to finding other employment, depletion of savings and the premature utilization of retirement benefits and other consequential damages. Plaintiff also has been caused to incur attorney fees and costs in the rightful pursuit of this action.

**WHEREFORE,** Plaintiff, Francienna B. Grant, requests the Court to grant such relief as may be appropriate, including equitable and injunctive relief; reinstatement and/or front pay damages, compensatory damages, punitive damages, as well as costs and attorney's fees against all of the Defendants. Moreover, Plaintiff hereby notifies Defendants that she intends to pursue her right to present expert testimony as a prevailing party and upon any and all monetary judgments rendered in her favor to compensate for any negative tax consequences of receiving a lump sum award of economic damages.

## SECOND COUNT
## (Intentional Interference with Employment Relationship)

51.   The Plaintiff, Francienna B. Grant, hereby repeats and incorporates by reference each and every allegation set forth in the preceding paragraphs of the Plaintiff's Complaint, as if more fully set forth at length herein.

52.   Defendants, Cilieki, Pulido, Persona and Crispin and/or John and Mary Does (1-4), or any of them individually or in conspiracy with one another, or both, wrongfully interfered with the Plaintiff's employment relationship with her employer by inducing her employer to terminate her services based upon unfounded allegations of inadequate or improper performance.

53.   Grant had a reasonable expectation and likelihood that her job would have continued but for Cilieki, Pulido, Persona, Crispin and/or John and Mary Does (1-4) unjustified interference. Indeed, Grant had been advises that she had performed satisfactorily prior to her reports of improper activity by Defendants.

54.   As a result of the Defendant's conduct set forth above, Plaintiff has been caused to suffer damages and is entitled to any and all loss wages and benefits, reinstatement to her former position or, alternatively, front pay. Additionally,

18

Plaintiff has suffered a loss to her reputation and good name. She has suffered emotional distress as a result of her loss and the hardship it has brought upon her. She suffers bodily injury manifested from her emotional distress, hardships and uncertainty with respect to finding other employment, depletion of savings and the premature utilization of retirement benefits and other consequential damages. Plaintiff also has been caused to incur attorney fees and costs in the rightful pursuit of this action.

WHEREFORE, Plaintiff, Francienna B. Grant, requests the Court to grant such relief as may be appropriate, including equitable and injunctive relief; reinstatement and/or front pay damages, compensatory damages, as well as costs and attorney's fees against the Defendants. Moreover, Plaintiff hereby notifies Defendants that she intends to pursue her right to present expert testimony as a prevailing party and upon any and all monetary judgments rendered in her favor to compensate for any negative tax consequences of receiving a lump sum award of economic damages.

# FOURTH COUNT
## (Violation of Public Policy)

55.   The Plaintiff, Francienna B. Grant, hereby repeats and incorporates by reference each and every allegation set forth in the preceding paragraphs of the Plaintiff's Complaint, as if more fully set forth at length herein.

56.   The Defendants, in taking adverse employment action against the Plaintiff, as described above, in retaliation for the Plaintiff having disclosed violations affecting patient safety, patient bill of rights and quality assurance, have acted in contravention to the clear mandate of public policy for the State of New Jersey.

57.   The public policy of the State of New Jersey mandates that Defendants, health care providers, provide safe, prompt and good medical care, ensure patient safety and refrain from deceptive practices.

58.   The public policy of the State of New Jersey mandates that care givers, as defined by N.J.A.C. 8:90-1.2, conduct a fair and thorough investigation regarding sentinel events.

59.   The Defendants failed to comply with public policy of the State of New Jersey in failing to properly and thoroughly investigate sentinel events and in terminating Grant's employment after she demanded that such events be investigated.

60.   As a direct result of the actions of the Defendants, contrary to the public policy for the State of New Jersey, the rights of the Plaintiff were violated, the Plaintiff has suffered mental anguish, loss and damage to her reputation, humiliation, emotional upset, and loss of dignity. The Plaintiff has suffered embarrassment.

WHEREFORE, Plaintiff, Francienna B. Grant, requests the Court to grant such relief as may be appropriate, including equitable and injunctive relief, reinstatement and/or front pay damages, compensatory damages, as well as costs and attorney's fees against the Defendants. Moreover, Plaintiff hereby notifies Defendant that she intends to pursue her right to present expert testimony as a prevailing party and upon any and all monetary judgments rendered in her favor to compensate for any negative tax consequences of receiving a lump sum award of economic damages.

## JURY DEMAND

The Plaintiff, Francienna B. Grant, hereby demands a trial by jury on all issues so triable.

Respectfully Submitted,

THE LAW OFFICE OF
MICHELLE J. DOUGLASS, L.L.C.

By:

Michelle J. Douglass, Esquire

Dated:   August 9, 2006

The Law Office of Michelle J. Douglass, L.L.C.
By: Michelle J. Douglass, Esquire
1201 New Road, Suite 335
Linwood, New Jersey 08221
(609) 788-3595
(609) 788-3599 - telefax
Attorney for Plaintiff

| | |
|---|---|
| FRANCIENNA B. GRANT<br>Plaintiff,<br><br>v.<br><br>OMNI HEALTH SYSTEMS OF<br>NEW JERSEY, ADVANTAGE<br>REHABILITATION, L.L.C.,<br>LINCOLN SPECIALTY CARE<br>CENTER, PAT CILIECKI,<br>RONILDA PULIDO, ROWENA<br>PERSONA and LUCY CRISPIN,<br>JOHN and MARY DOES (1-4),<br>individually, jointly and severally<br>Defendants. | SUPERIOR COURT OF<br>NEW JERSEY<br>LAW DIVISION<br>CUMBERLAND COUNTY<br><br>Docket No. CUM-L 822-06<br>Filed 8-10-2006<br>Civil Action<br><br>**COMPLAINT, JURY DEMAND<br>& DESIGNATION OF TRIAL<br>COUNSEL** |

Plaintiff, Francienna B. Grant residing in Cape May County, State of New Jersey, by way of complaint against the Defendants, Pat Cilieki, Ronilda Pulido, Rowena Persona, Lucy Crispin, Omni Health Systems of New Jersey, Advantage Rehabilitation, L.L.C. and Lincoln Specialty Care Center located at 1640 South Lincoln Avenue, Vineland, County of Cumberland, State of New Jersey, says:

AUG 22-2006  11:58                                    P.07 2

## THE PARTIES

1.   The Plaintiff, Francienna B. Grant, ("Grant") is an individual who resides in Cape May County, New Jersey.

2.   The Defendant, Omni Health Systems of New Jersey ("Omni"), is a business licensed by the State of New Jersey and is a multi-facility organization that owns nursing homes, including the Defendant, Lincoln Specialty Care Center. Omni also owns the Defendant, Advantage Rehabilitation, L.L.C.

3.   The Defendant, Advantage Rehabilitation, L.L.C., ("Advantage Rehabilitation") is a for-profit business with its main office located at 26 Journal Square, 16th floor, Jersey City, New Jersey, 07306 and employs individuals to work at Lincoln Specialty Care Center, located at 1640 Lincoln Avenue, Vineland, New Jersey, 08360.

4.   The Defendant Lincoln Specialty Care Center ("LSCC") is located at 1640 South Lincoln Avenue, Vineland, New Jersey and is a long term care facility providing on-site sub-acute rehabilitation, dialysis, IV therapy and other medical and personal care.

5.   The Defendant, Pat Cilicki, ("Cilicki") was at all time relevant hereto, the Regional Director of Nursing employed by Omni, and was responsible for the oversight of all nursing staff employed by Omni within her designated region, including

2

Lincoln Specialty Care Center. At all relevant times, Cileki was the employee, agent and servant of Omni Health Systems.

6.   The Defendant, Ronilda Pulido, ("Pulido") was at all times relevant hereto, the Regional Director of Rehabilitation employed by Advantage Rehabilitation, was responsible for the oversight of all rehabilitation staff employed by Omni within her designated region, including LSCC. Pulido, was at all times relevant hereto, Grant's immediate supervisor. At all relevant times, Pulido was the employee, agent and servant of Advantage Rehabilitation, L.L.C and/or Omni Health Systems.

7.   The Defendant, Lucy Crispin, ("Crispin") at all relevant times hereto, is a registered nurse and Manager of Unit A at LSCC and is responsible for all the staff and patients assigned to this long term care unit  and was hired by Advantage  Rehabilitation, L.L.C. and/or Omni  Health Systems. At all relevant times, Crispin was the employee, agent and servant of Advantage Rehabilitation, L.L.C and /or Omni Health Systems.

8.   The Defendant, Rowena Persona, ("Persona") at all times relevant hereto, is an Occupational Therapist hired by Advantage Rehabilitation and/or Omni Health Systems to perform quality assurance at LSCC. At all relevant times, Persona was the employee, agent and servant of Advantage Rehabilitation, L.L.C and /or Omni Health Systems.

3

9.    The Defendants, John and Mary Does (1 4) are owners, employees and/or representatives of Omni Health Systems, Advantage Rehabilitation, L.L.C and/or Lincoln Specialty Care Center who were involved and/or had any role in the decision to terminate the Plaintiff's employment as the Lead Therapist with Advantage Rehabilitation, L.L.C. in violation of the laws as more fully described below.

## FACTUAL BACKGROUND

10.   On or about January 12, 2004 the Plaintiff, Francienna B. Grant began employment for Advantage Rehabilitation, at the Lincoln Specialty Care Center (LSCC), as the Lead Therapist and treating Physical Therapist in the LSCC Rehabilitation Services Department. Grant was terminated from employment with Advantage Rehabilitation on January 17, 2006.

11.   At all relevant times, Grant was the Lead Therapist, and in accordance with the Rehabilitation Services Department Organizational Chart, Grant was supposed to be responsible for overseeing various positions in the Rehabilitation Services Department such as the Licensed Physical Therapist (LPT), Speech Language Pathologist (SLP), Registered Occupational Therapist (OTR), Licensed Physical Therapist Assistant (LPTA), Certified Therapist Assistant (COTA), and Rehabilitation Aides. In reality, the Rehabilitation

4

Department was short staffed from the date of Grant's hire through to her termination from employment.

12.   As a licensed Lead Physical Therapist, Grant became a liaison between the therapy staff and the other Departments within the facility. Grant's goal was to promote high quality patient care and maintain patient rights and dignity. She would be in frequent contact with the other departments and disciplines within the facility in order to achieve her goals.

13.   Grant performed her duties as the Lead Therapist in an exemplary manner. Indeed, on January 21, 2005 Grant received an exceptional performance evaluation. Grant's supervisor, Pulido, noted on Grant's performance evaluation "Fran is a competent physical therapist. She had shown expertise in clinical performance and decision making regarding patient's plan of care."

14.   On or about June 21, 2005, a therapist under the supervision of Grant noticed that a patient (ABC) assigned to Unit A, and who had recently undergone surgery for the installation of a pace maker, was in apparent distress while in the therapy room.

15.   The therapist immediately notified Defendant, Lucy Crispin, who was in charge of Unit A at the time. Crispin stated that she would take care of the matter. Instead, Crispin ignored the patient (ABC) and left work for the day advising no one of the patient's condition.

16.   Grant went to Unit A to check on the status of the patient (ABC). Grant observed the patient (ABC) in her wheelchair struggling to get to her room.   Alarmed, she contacted the nurse on duty so that the patient (ABC) would be attended to. Thereafter, it appeared that the needs of patient (ABC) were being addressed and Grant left the area. Grant later learned that the nursing department did not send the patient (ABC) to the hospital for care until many hours later.

17.   Grant placed a telephone call to her supervisor, Pulido, and told her that the patient (ABC) had been neglected by Unit A nursing staff when they failed to promptly respond to a patient (ABC) who had been in apparent distress. Grant stated that she believed that this patient (ABC) was left unattended and that this was wrong. Grant further informed Pulido that she believed that the Unit A nurses knew that this patient (ABC) had no one to advocate on her behalf since the only known living family member was her son who too was in the facility resided in the assisted living unit. Pulido advised that she would look into the matter. Grant told Pulido that she would not let this drop; she wanted the matter investigated.

18.   On June 22, 2005, Grant attended a daily Department Head meeting wherein the Administrator, Kathy Bell, Lucy Crispin and other department heads also attended. Grant inquired of the nursing staff the status of the patient referred to in the above paragraph. Grant expressed her

6

concern that the patient (ABC) had been neglected by nursing and wanted to know the reason(s) the patient (ABC) had not been provided with medical care for more than eight hours after it became apparent that the patient was in distress. When no one present provided any reasonable response and it was evident that it was a matter that no one other than Grant cared to discuss, Grant told everyone in the room that what had happened with this patient (ABC) was wrong. She named aloud the names of each of the individuals in the room to let them know that she was aware that they were witness to her concerns regarding this patient's (ABC) care and her reporting this in the Department Head meeting.

19.   On June 23, 2005, the patient (ABC) referenced in the above paragraph died. Upon learning that this patient (ABC) had died, Grant went to the Administrator's office and spoke with Administrator Bell to inquire into the status and circumstances leading up to the patient's (ABC) death. Grant was aware that the patient's (ABC) death may have been a "sentinel event", i.e., an unexpected occurrence involving a death, which required the need for immediate investigation and response. Administrator Bell advised Grant that she would look into the matter.

20.   Grant also spoke to Pat Saley, the Regional Quality Assurance Nurse employed by Omni Health Systems about the patient's (ABC) death on June 23, 2005. Saley said that She would have the Director of Nursing look into the matter.

7

21.   Upon information and belief, there has been no investigation or response regarding the patient (ABC) who died on June 23, 2005 as referenced above.

22.   On or about July 6, 2005, a care conference was held for the family of another patient (DEF). Present at the meeting were Grant, Crispin, Adrienne Goldsboro, Director of Social Services, Sandy Bechdorf, who was the past Director of Nursing and two visitors; one of whom had the Power of Attorney of the patient (DEF) and a friend of the patient (DEF). While at the meeting, Grant explained that the patient (DEF), a stroke victim, was making progress with his cognitive abilities and daily functions. After Grant gave her input about the Rehabilitation Department's perspective on the patient (DEF) she left the room. Grant was aware that the person who held the Power of Attorney for the patient (DEF) may have wanted to have the patient (DEF) remain in the facility indefinitely, that is, until his ultimate demise. Grant could not support this wish as the patient (DEF) had in fact been making cognitive development since his admission to LSCC.

23.   Upon information and belief, Crispin supported the position that the patient remain in the facility in accordance with the Power of Attorney's desire as referenced in the paragraph immediately above despite the patient's (DEF) true condition. As soon as Grant left the care conference on July 6, 2005, Crispin unprofessionally said to the visitors, that is, to the person who held the Power of Attorney and the friend, that

they should not pay attention to Grant because the Rehabilitation Department (Grant) did not know what they were talking about.

24.  The inappropriate statement by Crispin regarding the expertise of the Rehabilitation Department as described above was reported by Adrienne Goldsboro, Director of Social Services to Administrator Bell. Grant advised her immediate supervisor, Pulido of this situation and warned that she hoped Crispin was not misrepresenting the status of patients or the capabilities of the Rehabilitation Department in Grant's absence.

25.  Upon information and belief, shortly after the incident as immediately described above, another patient (GHI) who was assigned to Unit A, after suffering from a closed head injury, fell out of a chair because he was not wearing his Rehabilitation issued belt.

26.  The nursing staff is responsible to ensure that all patients utilize all equipment issued and prescribed by the Rehabilitation Department. Crispin and others attempted to cover up the fact that the patient (GHI) had fallen from his chair without having been secured with his prescribed safety belt. The nursing staff requested that Grant sign off on a document which described the incident as the patient (GHI) haven fallen out of bed. Grant advised that the incident report was untrue and that she would not sign the report. Later, Grant complained at a weekly meeting that the patient (GHI)

9

did not have his Rehabilitation issued belt on at the time of his fall.

27. The patient (GHl) who had fallen as a result of not having his safety belt on him at the time he was permitted to sit in a chair located near the nurse's station shortly thereafter died from head injuries suffered in this fall. Upon information and belief, this too constituted a sentinel event but was not investigated.

28. Grant thereafter began to complain that the Admissions Department was not properly classifying people for admission to the facility. Grant observed that Unit A, which is where the long-term patients were suppose to be located, were not receiving good care because the staff assigned to the unit tended to neglect them. For instance, many of the patients would be left in their beds all day because the staff did not want to exert the physical energy and/or time and/or work associated with moving the patients out of bed.

29. The staff in Unit A refused to get patients out of bed for physical therapy. The staff in Unit A would purposefully hide patient wheelchairs and offer the excuse that the wheelchair was lost or missing and, therefore, the patient had to remain in bed. This and other patient neglect issues especially concerned Grant with respect to the misclassification of patients for assignment to Unit A, when many times the patient was a sub-acute care patient who

required only short-term care for remediable or rehabilitable problems.

30.   On or about August 25, 2005, Grant reported to her supervisor, Pulido that the Restorative program was not being performed by the nursing staff. Grant also advised the Administrator, the Director of Nursing and the Assistant Director of Nursing that the nursing staff was not completing its duties under the Restorative program.

31.   On or about August 25, 2005, the weekly report submitted by Grant also reflected the fact that the LSCC staff continued to swap and misuse patient assigned wheelchairs and misplace (lose) assigned equipment in order to avoid job responsibilities. Grant expressed concern about patient safety because the facility had been previously cited by the State of New Jersey for violations with respect to patient issued equipment.

31.   On or about September 22, 2005, Grant reported that the nursing staff was not reporting to the Rehabilitation Department when patients were admitted to the facility and in the building. Grant advised that this and other violations of protocol were placing the facility in jeopardy with respect to licensing, and Medicare Violations.

32.   On or about October 16, 2005, Grant addressed a letter to Linda Dooley, a shareholder/owner of Advantage Rehabilitation, and Omni Health Systems, regarding highly unprofessional conduct exhibited toward Grant by the Director

AUG-22-2006  13:01

of Nursing with respect to an issue involving the billing information sent to an insurance company on behalf of a patient.

33.  The Director of Nursing, Linda Falluca, was screaming in front of other staff members and patients that the therapy notes from the Rehabilitation Department "sucked." The Director of Nursing, Falluca, used the word "sucked" several times in front of others including Grant.

34.  Later it was determined that the Rehabilitation Department properly submitted the information to the insurance company for which Falluca had claimed "sucked." The Director of Nursing, however, overreacted and immediately saw this as an opportunity to blame the Rehabilitation Department for wrongdoing because she was upset with the fact that Grant was properly reporting wrongdoing and patient neglect by the nursing staff for which she, as the Director of Nursing, was responsible.

35.  On or about December 9, 2005, Unit A Manager Crispin, who was angry that Grant continued to report patient neglect and other patient care issues by her staff, became verbally abusive and physically threatening to Grant.

36.  On or about December 11, 2005, Grant reported to her supervisor, Pulido, the incident on December 9, 2005 and that she feared for her physical safety as a result of Crispin's abusive behavior.

12

37.    On or about December 15, 2005, Grant requested a meeting with Pat Celieki to report the conduct of Crispin and more importantly, to inquire why none of her concerns about patient safety and neglect were being addressed. Grant again asked about the status of patient (ABC) who had died as a result of the nursing staff unreasonably failing to assess and address the patient's condition. Celieki informed Grant that she would look into it. Celieki never got back to Grant regarding any of her concerns.

38.    On or about December 20, 2005, Grant submitted her weekly report to Pulido which reflected continued concerns over missing equipment, Medicare fraud issues and overall patient neglect.

39.    On or about December 27, 2005, the Director of Nursing, Linda Falluca and the On-Site Admissions Coordinator, Jessica Alvarez were caught breaking into Grant's locked desk. Neither Falluca nor Alvarez had any business related reason for being in the Rehabilitation Department nor for breaking into Grant's locked desk.

39.    After the break in, Grant discovered that her "soft" notes and other records were missing. In particular, the documents that Grant had maintained with respect to patient (ABC) who had died on June 23, 2005 were missing.

40.    On or about December 29, 2005, Grant advised her supervisor, Pulido, that her desk had been broken into on December 27, 2005 and to request additional therapists for

13

the Rehabilitation Department in order to provide patients with physical therapy who were not receiving physical therapy despite the fact that they had paid for it.

41.   On or about January 3, 2005, Grant advised her supervisor, Pulido, that the Policy and Procedure book had been missing from the facility for three to four weeks and that the Policy and Procedure book should be in the facility and accessible at all times.

42.   On or about January 4, 2005, Grant questioned Defendant, Rowena Persona about a recent directive she issued requiring Grant and/or the Rehabilitation Department should provide anticipated minutes (billable time) on Medicare Data Sheets for patients not on caseload. Patients on the Rehabilitation Department's caseload are able to be evaluated for rehabilitation services and minutes for purposes of Medicare billing. Thus, billing may be submitted to Medicare for anticipated future treatment. Patients not on the Rehabilitation Department's caseload are not candidates for rehabilitation services and, therefore, there is not any legitimate reason to forecast anticipated billable minutes for submission for payment to Medicare. Grant refused to abide by the directive.

43.   On January 17, 2006, Defendant Pulido called Grant into an unexpected meeting wherein a Performance Evaluation of Grant was given.

14

44.   Defendant Pulido evaluated Grant's overall work performance as below satisfactory and cited that Grant was unable to maintain good working relationships both within the Department and with other Departments. Cited also was an unsatisfactory result from Rowena Persona regarding a Rehabilitation Operations Quality Assurance conducted by Persona. Grant was advised that she failed to "resolve personnel concerns at the departmental level"; and, that she did not represent "the organization in a positive and professional manner"; and, that she did not consult "with other departments as appropriate to collaborate in patient care and performance improvement activities."

45.   Immediately following the performance review, Pulido told Grant she was fired. Pulido provided no advance notice that Grant's job was in jeopardy. Grant was not provided with any prior warning that her performance was unsatisfactory.

46.   At all relevant times, Grant's performance of her duties as the lead Physical Therapist was satisfactory. Grant was terminated from employment because Defendants were threatened by Grant who called into question and reported quality assurance violations and other illegal conduct by Defendants.

15

FIRST COUNT
**(Conscientious Employee Protection Act)**

47.  The Plaintiff, Francienna B. Grant, hereby repeats and incorporates by reference each and every allegation set forth in the preceding paragraphs of the Plaintiff's Complaint, as if more fully set forth at length herein.

48.  Grant disclosed to her supervisors wrongful activity, practice and policy by Defendants and she objected to and refused to participate in any activity and/or practice which she reasonably believed to violate the law and/or that was incompatible with a clear mandate of public policy. N.J.S.A. 34:19-3.

49. As a direct and proximate result of Grant's disclosure of the wrongful activity, practice and policy of the Defendants, as well as her refusal to participate in illegal activity, she was retaliated against by Defendants and was caused to suffer an adverse employment action in the form of termination from her employment with Defendant Advantage Rehabilitation, L.L.C.

50.    As a result of the Defendant's conduct set forth above, Plaintiff has been caused to suffer damages and is entitled to any and all loss wages and benefits, reinstatement to her former position or, alternatively, front pay. Additionally, Plaintiff has suffered a loss to her reputation and good name.

She has suffered emotional distress as a result of her loss and the hardship it has brought upon her. She suffers bodily injury manifested from emotional distress, hardships and uncertainty with respect to finding other employment, depletion of savings and the premature utilization of retirement benefits and other consequential damages. Plaintiff also has been caused to incur attorney fees and costs in the rightful pursuit of this action.

**WHEREFORE,** Plaintiff, Francienna B. Grant, requests the Court to grant such relief as may be appropriate, including equitable and injunctive relief; reinstatement and/or front pay damages, compensatory damages, punitive damages, as well as costs and attorney's fees against all of the Defendants. Moreover, Plaintiff hereby notifies Defendants that she intends to pursue her right to present expert testimony as a prevailing party and upon any and all monetary judgments rendered in her favor to compensate for any negative tax consequences of receiving a lump sum award of economic damages.

## SECOND COUNT
### (Intentional Interference with Employment Relationship)

51.   The Plaintiff, Francienna B. Grant, hereby repeats and incorporates by reference each and every allegation set forth in the preceding paragraphs of the Plaintiff's Complaint, as if more fully set forth at length herein.

52.   Defendants, Cilieki, Pulido, Persona and Crispin and/or John and Mary Does (1-4), or any of them individually or in conspiracy with one another, or both, wrongfully interfered with the Plaintiff's employment relationship with her employer by inducing her employer to terminate her services based upon unfounded allegations of inadequate or improper performance.

53.   Grant had a reasonable expectation and likelihood that her job would have continued but for Cilieki, Pulido, Persona, Crispin and/or John and Mary Does (1-4) unjustified interference. Indeed, Grant had been advises that she had performed satisfactorily prior to her reports of improper activity by Defendants.

54.   As a result of the Defendant's conduct set forth above, Plaintiff has been caused to suffer damages and is entitled to any and all loss wages and benefits, reinstatement to her former position or, alternatively, front pay. Additionally,

18

Plaintiff has suffered a loss to her reputation and good name. She has suffered emotional distress as a result of her loss and the hardship it has brought upon her. She suffers bodily injury manifested from her emotional distress, hardships and uncertainty with respect to finding other employment, depletion of savings and the premature utilization of retirement benefits and other consequential damages. Plaintiff also has been caused to incur attorney fees and costs in the rightful pursuit of this action.

WHEREFORE, Plaintiff, Francienna B. Grant, requests the Court to grant such relief as may be appropriate, including equitable and injunctive relief; reinstatement and/or front pay damages, compensatory damages, as well as costs and attorney's fees against the Defendants. Moreover, Plaintiff hereby notifies Defendants that she intends to pursue her right to present expert testimony as a prevailing party and upon any and all monetary judgments rendered in her favor to compensate for any negative tax consequences of receiving a lump sum award of economic damages.

## FOURTH COUNT
### (Violation of Public Policy)

55.   The Plaintiff, Francienna B. Grant, hereby repeats and incorporates by reference each and every allegation set forth in the preceding paragraphs of the Plaintiff's Complaint, as if more fully set forth at length herein.

56.   The Defendants, in taking adverse employment action against the Plaintiff, as described above, in retaliation for the Plaintiff having disclosed violations affecting patient safety, patient bill of rights and quality assurance, have acted in contravention to the clear mandate of public policy for the State of New Jersey.

57.   The public policy of the State of New Jersey mandates that Defendants, health care providers, provide safe, prompt and good medical care, ensure patient safety and refrain from deceptive practices.

58.   The public policy of the State of New Jersey mandates that care givers, as defined by N.J.A.C. 8:90-1.2, conduct a fair and thorough investigation regarding sentinel events.

59.   The Defendants failed to comply with public policy of the State of New Jersey in failing to properly and thoroughly investigate sentinel events and in terminating Grant's employment after she demanded that such events be investigated.

20

60.   As a direct result of the actions of the Defendants, contrary to the public policy for the State of New Jersey, the rights of the Plaintiff were violated, the Plaintiff has suffered mental anguish, loss and damage to her reputation, humiliation, emotional upset, and loss of dignity. The Plaintiff has suffered embarrassment.

WHEREFORE, Plaintiff, Francienna B. Grant, requests the Court to grant such relief as may be appropriate, including equitable and injunctive relief, reinstatement and/or front pay damages, compensatory damages, as well as costs and attorney's fees against the Defendants. Moreover, Plaintiff hereby notifies Defendant that she intends to pursue her right to present expert testimony as a prevailing party and upon any and all monetary judgments rendered in her favor to compensate for any negative tax consequences of receiving a lump sum award of economic damages.

21

## JURY DEMAND

The Plaintiff, Francienna B. Grant, hereby demands a trial by jury on all issues so triable.

Respectfully Submitted,

THE LAW OFFICE OF
MICHELLE J. DOUGLASS, L.L.C.

By:

Michelle J. Douglass, Esquire

Dated: __August 9, 2006__